**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

| | |
|---|---|
| **MIRIAM HASKINS, et al.** | |
| **Plaintiffs,** | **Civ. No. 10-5044 (RMB/JS)** |
| **v.** | |
| **FIRST AMERICAN TITLE INSURANCE COMPANY** | |
| **Defendant.** | |

## OPINION

This Opinion addresses whether non-signatories to an insurance policy containing an arbitration clause should be compelled to arbitrate rather than litigate their claims. Plaintiffs allege they were overcharged for the title insurance policies they purchased as a condition of refinancing their mortgages. The beneficiaries of the policies were plaintiffs' non-party mortgage lenders. Plaintiffs' title insurer, First American Title Insurance Company ("First American"), seeks to compel arbitration pursuant to an arbitration clause included in the policies issued to plaintiffs' lenders. For the following reasons, First American's Motion to Stay and Compel Individual Arbitration is DENIED. [1]

---

[1] The named plaintiffs in the action are: Miriam Haskins ("Haskins"), Calvin Rogers ("Rogers"), Harry and Mary Groover (collectively, "Groovers"), and Jeanne Garnes ("Garnes"). Plaintiffs represent a proposed class of New Jersey homeowners who were allegedly charged a higher premium for title insurance than the statutorily required rate. Amended Complaint ("Amend. Compl.") ¶¶11-29. Plaintiffs' class action allegations are irrelevant to the present motion.

1

**BACKGROUND**

Plaintiffs are homeowners who refinanced their homes in 2005 (Haskins) and 2007 (Rogers, Garnes and the Groovers).  In order to proceed with their refinancing plaintiffs were required to purchase title insurance in the form of lenders' policies.  Although plaintiffs paid for the insurance policies at their closings, they were not named parties or beneficiaries in the policies.  The named insureds and beneficiaries were plaintiffs' mortgage lenders. The policies contained identical arbitration clauses which read:

> 13.    ARBITRATION.
>
> Unless prohibited by applicable law, either the Company [First American] or the insured [non-party mortgage lenders] may demand arbitration pursuant to the Title Insurance Arbitration Rules of the American Arbitration Association.  Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the insured arising out of or relating to this policy, any service of the Company in connection with its issuance or the breach of a policy provision or other obligation.  All arbitrable matters within the Amount of Insurance is $1,000,000 or less shall be arbitrated at the option of either the Company or the insured.

At their closings plaintiffs signed "HUD-1 Settlement Statements" which set forth the amounts they owed for title insurance.  As to the premium to be paid, title insurance companies such as First American are required to file its "schedule of fees, every manual of classifications, rule and plans pertaining thereto . . . which it proposes to use in [New Jersey]."  N.J.S.A. 17:46B-42.  The rates are set forth in a Manual of Rates and Charges.  First American is required to charge its approved filed rates.  N.J.S.A. 17:46B-42.d.  New Jersey law permits title insurers to satisfy their rate-filing requirements by joining a licensed title insurance organization that submits proposed rates to the New Jersey Department of Banking and Insurance for approval.  N.J.S.A. 17:46B-42.b; In re New Jersey Title Ins. Litigation, C.A. No. 08-1425, 2009 WL 3233529, at *1-2 (D.N.J. Oct. 5, 2009). The specific filed rates are not included in the lenders' policies, and plaintiffs allege they were unknown

2

when their properties were refinanced.  Plaintiffs allege that although First American filed its rates as required, it charged them more than the approved rate.  Amend. Compl. ¶¶ 37, 43.  The crux of plaintiffs' claim is that they were charged a "standard underwriting rate" rather than a lower "refinance" rate.[2]  See generally Amend. Compl. ¶¶ 36-40.

Plaintiffs' original complaint asserted claims under state and federal RICO statutes and the New Jersey Consumer Fraud Act.  Plaintiffs also alleged common-law and equitable fraud claims.  On April 4, 2011, the Honorable Renée Bumb, U.S.D.J., dismissed without prejudice plaintiffs' RICO and common-law fraud claims.  On October 25, 2011, Judge Bumb denied defendant's motion to dismiss plaintiffs' claim under the New Jersey Consumer Fraud Act.[3]

Although plaintiffs were not parties to the title insurance policies that covered their properties, First American argues they are bound by the arbitration clause contained therein under a theory of equitable estoppel.[4]  First American argues plaintiffs benefitted from the policies and are not permitted to "pick and choose" which policy terms are enforceable.  First American's Brief ("FAB") at 11.  First American also contends the arbitration clause covers all claims that "arise out of or relate to" the policies or any service provided under the policies, and that plaintiffs may not evade arbitration simply because they are not named insureds.  Id. at 12-13.  In addition, First American argues its motion was timely filed because it would have been futile prior to recent

---

[2]Haskins alleges defendant charged her $1,015 for title insurance instead of $419.  (Amend. Compl. ¶ 45).  Rogers alleges defendant charged him $593 instead of $286.  (Id. ¶ 47).  The Groovers allege defendant charged them $661.50 instead of $364.75.  (Id. ¶ 49).  Garnes alleges defendant charged her $955 instead of $691.  (Id. ¶ 51).

[3]Plaintiffs' unjust enrichment claim also survived First American's motion to dismiss.

[4]Schedule A to the policies identified, inter alia, the amount of insurance, the premium to be paid, and the insured (mortgage lender).

intervening caselaw.  (Id. at 14 (citing AT&T Mobility LLC v. Concepcion ("Concepcion"), 131 S.

Ct. 1740 (2011)).  First American also argues that compelling arbitration would not cause plaintiffs

undue prejudice.  Plaintiffs oppose First American's motion on several grounds.  Plaintiffs argue

equitable estoppel does not apply because they did not "exploit[] or benefit[] from the terms of the

agreement containing the arbitration clause."  Plaintiffs' Brief ("PB") at 9.  Plaintiffs deny their

claims seek to enforce any provisions of the policies.  Plaintiffs also argue the arbitration clause does

not encompass their claims because the clause is explicitly limited to legal disputes arising between

First American and the "insured" – i.e., the mortgage lenders.  In addition, plaintiffs argue First

American waived the right to pursue arbitration because it waited six months after the Supreme

Court's decision in Concepcion before it filed the instant motion.[5]

**DISCUSSION**

The standard of review for a motion to compel arbitration is the same standard applied to a

motion for summary judgment.  Kaneff v. Delaware Title Loans, Inc., 587 F.3d 616, 620 (3d Cir.

2009).  A court may grant summary judgment if the pleadings, depositions, answers to

interrogatories and admissions show that there is no genuine issue as to any material fact, and if the

court determines that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ.

---

[5]As noted, First American's claim that plaintiffs are bound to arbitrate is premised on its equitable estoppel argument.  Since the Court finds that equitable estoppel does not apply, there is no need to address plaintiffs' argument that the language of the arbitration clause does not encompass the present dispute.  The Court also need not address plaintiffs' argument that First American waived its right to compel arbitration.  Nevertheless, even if the Court equitably estopped plaintiffs from denying that the arbitration clause applied, it would be hard pressed to hold that plaintiffs must arbitrate their claims.  This is because the arbitration clause provides that only First American or the insured (mortgage lenders) may demand arbitration.  Despite the policy favoring the broad construction of arbitration clauses, the Court may not require a party to arbitrate a dispute which it has not agreed to so submit. United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582 (1960); Archdeacon v. Sherwood Inv. Services, C.A. No. 06-5077 (DMC), 2007 WL 1963679, at *2 (D.N.J. June 28, 2007).

4

P. 56(a).  When determining the existence of a genuine issue of material fact in the context of arbitration, "[t]he party opposing arbitration is given the benefit of all reasonable doubts and inferences that may arise."  Kaneff, 587 F.3d at 620 (internal quotation and citation omitted). Because the parties do not dispute the relevant facts, First American's motion is ripe for decision.

The black letter law regarding contractual arbitration provisions is relatively well-settled. "[A]rbitration is . . . a matter of contract between the parties; it is a way to resolve those disputes-but only those disputes-that the parties have agreed to submit to arbitration."  First Options of Chicago, Inc. v. Kaplan ("First Options"), 514 U.S. 938, 943 (1995).  In the absence of "clea[r] and unmistakabl[e]" evidence, "it is 'the court's duty to interpret the agreement and to determine whether the parties intended to arbitrate grievances concerning' a particular matter."  Granite Rock Co. v. International Broth. of Teamsters, 130 S.Ct. 2847, 2858 (2010) (quotation and citation omitted). Courts apply a two-step test to determine whether a cause of action is supplanted by an existing arbitration agreement.  Trippe Mfg. Co. v. Niles Audio Corp. ("Trippe"), 401 F.3d 529, 532 (3d Cir. 2005).  Courts first determine whether a valid agreement to arbitrate exists.  If a valid agreement exists, a court should then determine whether the agreement encompasses the dispute at issue.  Id. "When determining both the existence and the scope of an arbitration agreement, there is a presumption in favor of arbitrability."  Id.  This presumption is not absolute, however, and should be applied "only where a validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand; and . . . where the presumption is not rebutted."  Granite Rock Co., 130 S.Ct. at 2858-859.  If a valid and enforceable arbitration agreement is broad in its scope, "[a]n order to arbitrate . . . should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  Century

Indem. Co. v. Certain Underwriters at Lloyd's, London, 584 F.3d 513, 556 (3d Cir. 2009) (quotation and citation omitted). If the arbitration agreement is itself narrowly crafted, it should not be presumed that the parties agreed to arbitrate any and all disputes. Id. If an agreement to arbitrate exists and the dispute is encompassed by the agreement, the decision to enforce arbitration is mandatory. Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985); Great Western Mortg. Corp. v. Peacock, 110 F.3d 222, 228 (3d Cir. 1997). In this case it is plain that plaintiffs are not contractually bound to arbitrate.[6] Although plaintiffs paid for the policies, they were neither parties to nor beneficiaries of the insurance contracts. Nevertheless, this is not the end of the story.

Although a party may not ordinarily be compelled to arbitrate an issue it has not agreed to submit to arbitration, non-signatories such as plaintiffs may be bound to arbitrate under applicable principles of contract and agency law. E.I. DuPont de Nemours and Co. v. Rhone Poulence Fiber and Resin Intermediates, S.A.S. ("DuPont"), 269 F.3d 187, 194 (3d Cir. 2001); Alfano v. BDO Seidman, LLP 393 N.J. Super. 560, 568 (App. Div. 2007). "[F]ederal courts should generally apply ordinary state-law principles that govern the formation of contracts to assess whether the parties agreed to arbitrate a certain matter . . . ." Rent-A-Center, West, Inc. v. Jackson, 130 S. Ct. 2772, 2783 (2010) (internal quotation marks and citation omitted). Under New Jersey law, a non-signatory may be bound to an arbitration agreement under one of several theories: (1) incorporation by reference, (2) assumption, (3) agency, (4) third-party beneficiary, (5) veil-piercing/alter ego, and (6) waiver and estoppel. See EPIX Holdings Corp. v. Marsh & McLennan Companies, Inc., 410 N.J. Super. 453, 463 (App. Div. 2009); Alfano, 393 N.J. Super. at 569. First American relies exclusively

---

[6]This is a different issue than determining whether the language in the arbitration clause is broad enough to encompass a dispute between plaintiffs and First American.

on the theory of equitable estoppel to support its motion.  Under New Jersey law "[e]quitable estoppel is conduct, either express or implied, which reasonably misleads another to his prejudice so that a repudiation of such conduct would be unjust in the eyes of the law."  McDade v. Siazon, 208 N.J. 463, 480 (2011) (quotation and citation omitted).  "The doctrine is designed to prevent injustice by not permitting a party to repudiate a course of action on which another party has relied to his detriment."  Angrisani v. Financial Technology Ventures, L.P., 402 N.J. Super. 138, 153 (App. Div. 2008) (quoting Knorr v. Smeal, 178 N.J. 169, 178 (2003)).  The theory should be applied "only in very compelling circumstances."  IBS Financial Corp. v. Seidman & Assoc., L.L.C., 136 F.3d 940, 948 (3d Cir. 1998) (quoting Palatine I v. Planning Board, 133 N.J. 546, 560 (1993)).  In Angrisani, supra, the New Jersey Appellate Division addressed whether to compel a non-party to arbitrate pursuant to an equitable estoppel theory.  The decision held that in order to invoke equitable estoppel to bind a non-signatory to arbitration, "[the party relying upon this doctrine] must show that [the other party] engaged in conduct, either intentionally or under circumstances that induced reliance, and that [the party relying upon the doctrine] acted or changed [its] position to [its] detriment."  Angrisani, 402 N.J. Super. at 153 (alterations in original) (quoting Knorr, 178 N.J. at 178).[7]

---

[7]In Angrisani, the plaintiff simultaneously entered into an employment contract with defendant Nexxar Group, Inc. ("Nexxar") and a stock purchase agreement with defendant Financial Technology Ventures, L.P. ("FT Ventures").  Although the employment contract included an arbitration clause, the stock purchase agreement did not.  After the plaintiff filed suit against both companies, FT Ventures asserted the doctrine of equitable estoppel in an attempt to compel arbitration.  At trial, the court granted the motion, citing "a substantial intertwining of the wrongs and a tangible but-for connectivity" between the claims raised against each defendant party.  Angrisani, 402 N.J. Super. at 146.  On appeal, the decision as to FT Ventures was reversed.  Id. at 151-156.  The court relied on two lines of reasoning to reach its conclusion.  First, while noting that the plaintiff's assertion of tortious interference against FT Ventures was "directly related" to his employment agreement with Nexxar, the court found that the employment agreement imposed no duty on the plaintiff to arbitrate with FT Ventures.  Id. at 152.  Next, addressing the question of equitable estoppel, the court found "[p]laintiff did not engage in any course of conduct that could support a finding of equitable estoppel under this conception of the doctrine."  Id. at 153.

The New Jersey Appellate Division recently addressed equitable estoppel again in <u>Hirsch v. Amper Financial Services, LLC</u>, 2012 WL 1379976 (N.J. Super. App. Div. April 23, 2012).  In that case the Court compelled signatories to an agreement containing an arbitration clause to arbitrate their dispute with non-signatories because the claims and the parties were integrally related to an ongoing, arbitrable dispute involving the signatories.  <u>See also</u> <u>Angrisani</u>, 402 N.J. Super. at 154 (addressing equitable estoppel in connection with claims inextricably intertwined with a contract containing an arbitration clause).   In <u>Hirsch</u>, the plaintiffs and a third-party defendant were signatories to an account agreement that contained an arbitration clause; no such agreement existed between the plaintiffs and the defendants.  Plaintiffs were already engaged in arbitration with the third-party defendant on claims arising from the same facts, and the Court noted extensive links between the defendants and an individual who was a party to the arbitration clause.  Affirming the lower court's decision granting the third-party defendant's motion to compel arbitration, the Court ruled, "the combination of the requisite nexus of the claim to the contract together with the integral relationship between the non-signatory and the other contracting party [is] recognized as a sufficient basis to invoke estoppel."  <u>Hirsch</u>, <u>supra</u>, at *5 (emphasis omitted) (quoting <u>EPIX Holding Corp.</u>, 410 N.J. Super. at 465-66 (citation omitted)).  The Court reasoned that, because the arbitration and the legal action arose from the same transactions, the legal and factual issues raised were

In seeking affirmation of the trial court's order, FT Ventures cited federal circuit cases in which parties were bound to arbitration based on a finding by the courts of "claims inextricably intertwined with a contract containing an arbitration clause." <u>See id.</u> at 154 (quotations and alterations omitted). "[T]hose cases," the court observed, "generally involve situations where a party to a contract containing an arbitration clause seeks to bring an action based on the contract against a non-signatory to the contract that is closely aligned to a contracting party, such as a parent or successor corporation." <u>Id.</u> at 154 (citing, for example, <u>Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.</u>, 10 F.3d 753 (11th Cir. 1993)). The court concluded that an interpretation of those cases that required non-signatories to arbitrate based solely on the assertion of claims "inextricably intertwined" to a contract containing an arbitration clause "could not be reconciled with the fundamental principle that 'a party can be forced to arbitrate only those issues it has specifically agreed to submit to arbitration[.]'" <u>Id.</u> (quoting <u>First Options</u>, 514 U.S. at 945).

"intertwined" and would benefit from resolution in one proceeding.  Id.  The Court also noted the "complex and intertwined relationship" between the various parties as a basis for invoking equitable estoppel.  Id.

First American is not arguing that plaintiffs engaged in any conduct on which it relied to its detriment.  Therefore, the equitable estoppel discussion in Angrisani does not apply.  Similarly, First American does not argue that plaintiffs' claim is integrally related or intertwined with an ongoing arbitration.  Thus, the equitable estoppel discussion in Hirsch does not apply.  In addition, First American is not pursuing any of other theories mentioned in Epix Holdings, supra.  Again, however, this is not the end of the story.

The Third Circuit addressed equitable estoppel in DuPont, supra, where the Court identified two lines of cases:

> First, courts have held non-signatories to an arbitration clause when the non-signatory knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement . . . .  Second, courts have bound a signatory to arbitrate with a non-signatory "at the non-signatory's insistence because of 'the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the non[-]signatory's obligations and duties in the contract . . . and [the fact that] the claims were intimately founded in and intertwined with the underlying contract obligations.'"

DuPont, 269 F.3d at 199 (quotation and citation omitted).  First American is pursuing the "knowingly exploit" theory of equitable estoppel.[8]   Because this case involves an attempt by a signatory to an arbitration clause to compel a non-signatory to arbitrate, the second theory of equitable estoppel discussed in DuPont does not apply.

Under the "knowingly exploit" theory of equitable estoppel, a non-signatory may be bound

---

[8]Using the same language invoked by DuPont, the Fifth Circuit refers to this as "direct-benefits estoppel."  See, e.g., Hellenic Investment Fund, Inc. v. Det Norske Veritas, 464 F.3d 514, 517-18 (5th Cir. 2006).

by an arbitration clause if it "embraces the agreement." Bouriez v. Carnegie Mellon Univ., 359 F.3d

292, 295 (3d Cir. 2004). "A non-signatory can 'embrace' a contract containing an arbitration clause

in two ways:  (1) by knowingly seeking and obtaining 'direct benefits' from that contract; or (2) by

seeking to enforce the terms of that contract or asserting claims that must be determined by reference

to that contract." Noble Drilling Services, Inc. v. Certex USA, Inc., 620 F.3d 469, 473 (5th Cir.

2010).  In this way, equitable estoppel prevents a non-signatory from "cherry-picking" beneficial

contract terms while ignoring other provisions that don't benefit it or that it would prefer not to be

governed by such as an arbitration clause. Invista S.a.r.l. v. Rhodia, S.A., 625 F.3d 75, 85 (3d Cir.

2010); accord DuPont, 269 F.3d at 200 ("To allow [a plaintiff] to claim the benefit of the contract

and simultaneously avoid its burdens would both disregard equity and contravene the purposes

underlying enactment of the Arbitration Act." (quoting Int'l Paper Co. v. Schwabedissen Maschinen

& Anlagen GMBH ("Int'l Paper"), 206 F.3d 411, 418  (4th Cir. 2000))).[9]

In DuPont, the a subsidiary of the plaintiff company entered into a joint venture agreement

with two other companies.  Although DuPont was not a party to the agreement, the agreement stated

that DuPont would "assist . . . in the balancing of foreign exchange during the [joint venture's] initial

years," and that DuPont would "not take action detrimental to the interest or well-being of the [joint

venture]." 269 F.3d at 191, 192.  The joint venture agreement included an arbitration clause

encompassing "any dispute or claim or difference of any kind whatsoever aris[ing] in connection

with the interpretation or implementation of [the] Contract." Id. at 192.  After the joint venture

---

[9]Although similar to cases involving third-party beneficiaries, the Third Circuit distinguishes
between the two theories:  the theory of the third-party beneficiary examines "the intentions of the parties
at the time the contract was executed," while equitable estoppel "looks to the parties' conduct after the
contract was executed." DuPont, 269 F.3d at 200 n.7.

failed, DuPont filed suit against several of the parties involved in the venture, including Rhone

Poulenc Fiber and Resin Intermediaries ("Rhodia Fiber").  In the suit, DuPont alleged Rhodia Fiber

breached an oral agreement to fully perform all the obligations contemplated by the Joint Venture.

Affirming the district court's decision to deny the defendants' motion to compel arbitration against

DuPont, the Third Circuit first determined that DuPont had neither "embraced the Agreement itself

during the lifetime of the Agreement, or that it received any <u>direct</u> benefit under the Agreement."

<u>Id.</u> at 200 (emphasis in original).  The court expressed concern, however, that DuPont's claim against

Rhodia Fiber for breach of its oral agreement appeared to "(a) embrace[] the underlying Agreement

and (b) require[] proof that Rhodia Fiber ultimately breached the underlying Agreement."  <u>Id.</u> at 201.

Nevertheless, the court held that DuPont was not obligated to arbitrate the dispute because its case

rested not on whether Rhodia Fiber breached the joint agreement, but on  the defendant company's

conduct in connection with its oral promise:

> On the one hand, we must be careful about disregarding the corporate form and treating a
> non-signatory like a signatory.  On the other hand, by alleging, albeit by virtue of a separate
> oral agreement, that Rhodia Fiber failed to secure loan guarantees, DuPont's claim against
> Rhodia Fiber implicates, at least in part, the very Agreement which DuPont repudiates to
> avoid arbitration.  It is, however, that separate oral agreement that saves the day for DuPont
> because, wholly apart from whether Rhodia Fiber breached the Agreement, what is at the
> core of this case is the conduct and the statements of the appellants' representative [in
> making the oral promise].

<u>Id.</u>

Relying on <u>DuPont</u> and other applicable authority discussed herein, the Court finds that

plaintiffs are not bound by equitable estoppel to arbitrate their claim against First American.

Plaintiffs are not knowingly exploiting any terms in their insurance policies, they did not receive a

direct benefit from the policies, and they are not seeking to enforce terms of their policies or claims

that must be determined by reference to their policies.  The crux of First American's argument is that

11

plaintiffs are seeking to exploit a benefit from the policies they paid for, and are therefore bound by all the terms in the policies, including the arbitration provision.  See FAB at 10.  ("Plaintiffs seek to enforce the refinance rate as a term of their lenders' policies, which also included an arbitration clause.").  First American argues that plaintiffs are "knowingly exploiting" their title insurance policies by insisting that they only pay the regulatory approved premium, and further argues they are selectively choosing which provisions of their policies to enforce.  Id. at 8-9.  The Court disagrees.

Plaintiffs are not seeking to exploit a provision in First American's insurance contract. Instead, plaintiffs are simply seeking to assure that First American complies with its filed rates and N.J.S.A. §17:46B-42.  There is no doubt that, like DuPont, plaintiffs' claim "implicates" their insurance policies.  However, as DuPont indicates, this is not enough to compel arbitration on a theory of equitable estoppel.  269 F.3d at 200-201; see also Invista S.a.r.l. v. Rhodia, S.A. ("Invista I"), Civil No. 08-941 (RBK/JS), 2009 WL 1439407, at *4 (D.Del. May 20, 2009) ("[A] plaintiff will not be bound by an arbitration provision when its claims are related to but not directly based on the agreement."), appeal dismissed, 625 F.3d 75 (3d Cir. 2010).  DuPont looked at the "core of the case" when it decided that DuPont's oral agreement was not subject to arbitration even though it touched on an arbitrable matter.  269 F.3d at 201.  Similarly, the core of plaintiffs' claim is that First American breached a statutory duty, not a provision of their policies.  This is not a case where plaintiffs are exploiting a price provision contained in First American's policy.  For example, if First American's policy guaranteed plaintiffs the lowest rate in the applicable geographic market, and plaintiffs sued because they found a lower rate, the result of First American's motion would likely be different.  Similarly, if there was a dispute as to the scope of First American's coverage or duty to defend, the result would also likely be different because plaintiffs would be seeking to take

12

advantage of specific terms in First American's policy.  Here, however, the gravaman of plaintiffs' claim as to the cost of their policies does not derive from the policies themselves but instead from an independent source--the statutorily approved rates.  This source, in turn, does not derive or depend on any provision in First American's policies.  Therefore, arbitration may not be compelled. Plaintiffs insistence on paying no more than the statutorily approved rate for the policies they bought to benefit their lenders does not mean they "embraced" or "exploited" their policies.  See Levine v. First American Title Insurance Company, 682 F. Supp. 2d 442, 468 (E.D.Pa. 2010) (applying PA law) (First American's Rate Manual imposed a duty to charge the prescribed rates independent of the insurance contract).

In Dupont the Third Circuit relied in part on Int'l Paper, supra.  In Int'l Paper, the court bound a non-signatory to arbitration because its claims were "integrally related to" the contract containing the arbitration provision.  See 206 F.3d at 418 n.6.  Specifically, the court found that "International Paper allege that Schwabedissen failed to honor the warranties in the . . . contract, and it seeks damages, revocation, and rejection in accordance with that contract."  Id. at 418 (quotation omitted).  "International Paper's entire case," the court concluded, "hinges on its asserted rights under the [contract containing the arbitration clause.]"  Id.  Unlike Int'l Paper, plaintiffs' claim does not "hinge" on rights flowing from their policies.

First American does not contest that plaintiffs' policies did not specifically indicate that plaintiffs would be charged a "refinance rate," or that the polices did not indicate that plaintiffs' charges were those filed with and approved by the State of New Jersey.  Instead. First American argues its rates were incorporated into its policies by the "filed rate doctrine."  According to First American, it therefore follows that plaintiffs are attempting to benefit form a term in their policies.

13

The problem with First American's argument is that it is akin to putting a square peg in a round hole-
-the argument does not fit.  The filed rate doctrine does not apply in the context of determining
whether a non-signatory is equitably estopped from denying arbitration.

"The filed rate doctrine provides that a rate filed with and approved by a governing regulatory
agency is unassailable in judicial proceedings brought by ratepayers."  Alston v. Countrywide
Financial Corp., 585 F.3d 753, 763 (3d Cir. 2009).  The doctrine "is really not so much a judicially
created 'doctrine' as an application of explicit statutory language."  Borough of Ellwood City v. Fed.
Energy Regulatory Comm'n, 583 F.2d 642, 648 (3d Cir. 1978).  It is a preemptive doctrine, which
prevents parties from raising legal challenges to the validity of rates which have previously been
filed with and approved by a governing regulatory agency.  "The filed rate doctrine is a product of
the deference which courts give to the ratemaking and regulatory processes of administrative
bodies." Richardson v. Standard Guar. Ins. Co., 371 N.J. Super. 449, 459-60 (App. Div. 2004). "The
doctrine is based on the understanding that a regulated entity is forbidden from charging rates for its
services other than those properly filed with the appropriate federal regulatory authority."  Id.
(alterations omitted) (quoting Weinberg v. Sprint Corp., 173 N.J. 233, 242 (2002)).

The filed rate doctrine has two purposes, nonjusticiability and nondiscrimination, neither of
which apply here.  In re New Jersey Title Ins. Litigation, C.A. No. 08-1425, 2010 WL 2710570, at
*1 (D.N.J. July 6, 2010).  The nonjusticiability purpose reflects the reluctance of courts to second-
guess the filed rate decisions of a regulatory agency.  Id. at n.1.  The nondiscrimination principle
reflects courts' inability to cure a consumer's rate-based injury without discriminating against other
customers.  Id.  First American does not assert that the filed rate doctrine bars plaintiffs' claims, but
instead argues that plaintiffs are presumed to have constructive knowledge of the filed tariff, and that

14

their claims therefore arise out of the contract's terms.  See FA Reply at 7-9.  Whether or not plaintiffs had constructive knowledge of the rates they should have paid is not relevant to deciding whether equitable estoppel applies.  First American's argument is advanced without legal support for its ultimate conclusion, and the Court is not persuaded that a doctrine designed to promote deference to the oversight of a regulatory agency has any bearing on whether plaintiffs' claims arise under the terms of an insurance policy for the purpose of applying equitable estoppel.

Relying upon American Bankers Insurance Group v. Long, 453 F.3d 623, 627-28 (4th Cir. 2008), First American argues that plaintiffs' decision not to raise a claim for breach of implied contract "merely reflects artful pleading and does not alter the analysis."  FAB at 10.  The Court rejects First American's "artful pleading" argument because the Court's analysis focuses on plaintiffs' factual allegations rather than the legal causes of action asserted.  Hirsch, supra, at *3. Further, First American's reliance on American Bankers Insurance Group is misplaced because that case involved a non-signatory who sought to enforce an arbitration clause against a signatory.  The Fourth Circuit noted that a non-signatory could be bound by the terms of an arbitration agreement if the claims "arise from the contract containing the arbitration clause," but stated explicitly that the analysis was rooted in different language than the language used to bind a signatory.  While a signatory could be bound based on his or her reliance on the terms of the agreement in pleading a complaint, a non-signatory is bound as a result of the direct benefit received pursuant to the agreement itself.  Id. at 628 (distinguishing the "rely on" test from the "direct benefit" test).  While the Fourth Circuit recognizes the two concepts as rooted in a common understanding that a party should not be permitted to deny the validity of an arbitration clause when the party's claims "arise from" the underlying contract, see id., the Third Circuit treats the two scenarios differently, and the

15

Court therefore declines to bind plaintiffs on these grounds.  See Dupont, 269 F.3d at 199, 202 (noting and distinguishing the two theories of equitable estoppel).

The Court also disagrees that Washington Mutual Finance Group, LLC v. Bailey, 364 F.3d 260 (5th Cir. 2004) supports plaintiffs' position that avoidance of the arbitration clause is inequitable.  In that case, illiterate plaintiffs sued a financial institution, claiming they were misled into buying insurance policies while obtaining consumer loans.  As part of the transactions, the plaintiffs signed arbitration agreements.  The wife of one of the plaintiffs alleged she had co-signed with her husband, and also filed suit.  The Fifth Circuit determined that her claims exclusively asserted rights flowing from the loan and insurance agreements and that, although she had not signed the arbitration agreement, it would be inequitable for her to "su[e] based upon one part of a transaction that she says grants her rights while simultaneously attempting to avoid other parts of the same transaction that she views as a burden--namely, the arbitration agreement." Id. at 268.  As discussed earlier, this case is distinguishable because the rates plaintiffs seek to enforce were not express provisions of the lenders' policies.  Plaintiffs are not seeking to enforce a specific contractual right while at the same time trying to avoid the contractual arbitration clause.

First American insists that  plaintiffs should be bound by the arbitration agreement because the lenders' policies "'benefited' (sic) them by allowing them to obtain home loans and eliminating 'the risks of bad title.'"  FAB at 10.  This argument is off base because it ignores the reality of what occurred here.   The fact of the matter is that the policies primarily benefitted the named beneficiaries--plaintiffs' mortgage lenders.  In the event of a title dispute, the lenders wanted to be assured that their loans would be repaid.  Amend. Compl. ¶30.  The lenders also needed title insurance for any mortgage they intended to sell in the secondary market.  Id.  At best, plaintiffs

16

received an indirect benefit from their policies.  Equitable estoppel does not bind a non-party to arbitrate where it only receives an indirect benefit from the contract containing the arbitration clause.

"[T]he benefit derived from an agreement is indirect where the nonsignatory exploits the contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement itself." MAG Portfolio Consultant, GMBH v. Merlin Biomed Group LLC, 268 F.3d 58, 61 (2d Cir. 2001).  The decision in Quanqing (Changshu) Cloth-Making Co. Ltd. v. Pilgrim Worldwide Trading, Inc. ("Changshu"), Civ. No. 09-3785, 2010 WL 2674589, at *1. (D.N.J. June 29, 2010) supports plaintiffs.  In that case, the defendant engaged in a business deal with a third-party company, which in turn contracted with the plaintiff.  As part of the business arrangement, the third party sent the defendant a "Sales Confirmation" which memorialized the agreement and referenced the plaintiff, but which the defendant did not sign.  Although the defendant benefitted from the contractual relationship embodied in the Sales Confirmation by receiving the goods described therein, the district court found that the defendant was not bound by the arbitration clause in the agreement between the plaintiff and the third party.  Id. at *3.  The Court noted that the defendant had "not actively sought direct benefits under the agreement itself or sought to enforce or exploit express provisions of that contract. Id.  An analogous situation exists here.  See also Trippe, 401 F.3d at 534 (holding that purchase of rights contained in third party contract did not confer direct benefit on plaintiff company, and did not estop it from challenging contract's arbitration clause); Invista I, supra, at *5 (holding that the plaintiff's direct benefit did not arise from an agreement containing an arbitration provision, but from its independent contract with a signatory to the agreement at issue).  In this case, plaintiffs' policies were intended to indemnify the lenders and to protect their interests in the refinanced properties.  Amend. Compl. ¶ 30.  The lenders' policies offset

17

the risk faced by the lenders.  The Court does not accept the notion that if the underlying fact allegations in plaintiffs' complaint merely "touch matters" covered by First American's policies then the claims are arbitrable.  See FA Reply at 6-7.  This indirect benefit does not establish that plaintiffs "embraced" the agreement to an extent that equitable estoppel should apply.  Substantial case law supports the notion that since plaintiffs received an indirect, rather than a direct benefit from First American's policies, plaintiffs are not equitably estopped them from pursuing litigation rather than arbitration.  See, e.g., DuPont, 269 F.3d at 200; Thomson-CSF, 64 F.3d at 779 (indirect benefit insufficient to apply equitable estoppel to a non-signatory); see also Lawson v. Life of the South Ins. Co., 648 F.3d 1166, 1172 (11th. Cir. 2011) ("Under Georgia law, a plaintiff's claims must directly, not just indirectly, be based on the contract containing the arbitration clause in order for equitable estoppel to compel arbitration of those claims."); R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n., 384 F.3d 157, 161 (4th Cir. 2004) (a non-signatory is estopped from refusing to comply with an arbitration clause when it is seeking or receives a "direct benefit" from a contract containing an arbitration clause).

Judge Bumb's decision in Hunish v. Assisted Living Concepts, Inc., C.A. 09-3163 (RMB/AMD), 2010 WL 1838427 (D.N.J. May 6, 2010), supports the Court's ruling.  That decision identified three instances in which courts require non-signatories to arbitrate their claims: (1) where a non-signatory brings an action as a signatory's agent, (2) where a non-signatory has asserted rights "flowing from the contract," and (3) where a non-signatory's claims are closely interrelated with arbitrated claims.[10]  First American argues plaintiffs are asserting rights "flowing from" their

---

[10]As to this third situation, Judge Bumb noted that the Third Circuit eschewed this approach in DuPont, supra, 269 F.3d at 202.  See Hunish, supra, at *7.  DuPont and Hunish were decided before the Appellate Division's recent decision in Hirsch, supra.

insurance policies.  The Court disagrees.

In <u>Hunish</u>, the decedent's estate claimed the decedent died as a result of being discharged from an assisted living facility.  The facility represented to the decedent that once her personal resources were exhausted, Medicaid would assume the payments for her housing.  Once the decedent's funds were exhausted, however, the facility moved and ultimately discharged her, claiming a lack of space for Medicaid-funded residents.  The arbitration clause at issue appeared as an appendix to the residency contract.  The decedent signed the residency contract, but did not sign the arbitration clause.  <u>Hunish</u>, <u>supra</u>, at *5.  The decedent's son signed the arbitration clause, identifying himself as an individual exercising power of attorney on the decedent's behalf.  <u>Id.</u> Although the estate argued that the son's power of attorney was not in effect at the time he signed the arbitration clause, the court concluded the estate was bound to the arbitration clause under a theory of agency.  <u>Id.</u> at *5-6.  Even if agency did not apply, however, the court ruled that the estate was estopped from challenging arbitration because its claims "concurrently [sought] to enforce provisions of the very same contract."  <u>Id.</u> at *6.  In the same action, the decedent's son and grandson raised several claims against the facility.  Because the surviving family members raised independent claims for personal injuries, the Court recognized they had not assented to the arbitration agreement contained in the residency contract.  <u>Id.</u> at *7.  The court determined, however, that four of the independent claims sounded in contract law, and therefore asserted rights "flowing from" the residency contract.  <u>Id.</u>  The court noted that the claims "[sought] to impose liability upon Defendant for its conduct in obtaining assent to and performing the Contract."  <u>Hunish</u>, <u>supra</u>, at *7.  <u>See</u> <u>also</u> <u>Int'l Paper</u>, 206 F.3d at 418 (binding non-signatory that raised claims and sought relief "integrally related" to contract containing arbitration provision).  In addition, the court concluded that two

19

claims, alleging "Conspiracy to Violate RICO" and "Violation of NJ-RICO," asserted misconduct in "requiring payment for [the decedent's] financial obligation-a contractual duty." <u>Hunish</u>, at *7. Importantly, the disputed payments in <u>Hunish</u> were an express term of the residency contract: the decedent's son and grandson alleged that the obligation to pay was itself a violative act, arising from the defendant's alleged misrepresentations. Plaintiffs' claims are distinguishable because the rates they seek to enforce were not express terms of their policies. It is hard to see how plaintiffs' claim flows from their policies when, as plaintiffs point out, they are not relying on a single word contained in their policies.[11]

Although First American argues that <u>In re California Title Insurance Antitrust Litigation</u>, No. 08-1341, 2011 WL 2566449 (N.D. Cal. June 27, 2011), is "directly on point" (FAB at 13), they are mistaken. In that case the plaintiffs alleged the defendant's title insurance companies "manipulated, controlled and maintained the cost of title insurance" and "fixed prices." <u>Id.</u> at *1. Over the plaintiffs' objection the court granted the insurers' motion to compel arbitration even though, like here, the plaintiffs were not parties to the contracts containing the arbitration clause. In a one paragraph discussion addressing the plaintiffs' non-party argument (<u>id.</u> at *4), the Court simply stated, "the loan agreements contain arbitration provisions which cover the real estate transactions about which Plaintiffs complain." <u>Id.</u> <u>California Title</u> is inapposite for at least four reasons: (1) the case did not address the alleged failure to charge statutorily approved rates that were not included in the insurers' policies; (2) the decision did not discuss <u>DuPont</u>, <u>supra</u>; (3) the decision did not

---

[11]<u>See</u> February 16, 2012 Transcript of Oral Argument at 28:4-6.

address the lynchpin of First American's argument, i.e., equitable estoppel[12] and; (4) in contrast to the plaintiffs in California Title, First American is not arguing that the arbitration clause encompassed plaintiffs' claims regardless of the Court's decision as to equitable estoppel.[13]  Instead, First American argues that the only reason plaintiffs are bound to the arbitration clause is because of equitable estoppel.

First American argues plaintiffs should be compelled to arbitrate because a non-signatory is estopped from challenging an arbitration clause if he or she brings claims based on other provisions of the contract.   "[A] party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him."  Hunish, supra, at *6 (quoting Int'l Paper, 206 F.3d at 418).  Plaintiffs have not done that here, as evidenced by the fact that they are not insisting that any provision in their policies be enforced.  Plaintiffs' claim does not "hinge on" the insurance policy as Int'l Paper referenced (206 F.3d at 418), but rather relies on the rates derived from a New Jersey statute.  This case is more akin to DuPont where the

---

[12]First American's briefs repeatedly emphasize its reliance on equitable estoppel: "[P]laintiffs' invocation of First American's filed premium rates estops them from challenging the validity of the arbitration clause in the loan policies they purchased" (FAB at 1); "[t]he doctrine of equitable estoppel precludes Plaintiffs from disputing the validity of the arbitration clause, whether based on their status as non-signatories to the policy, non-insureds, or otherwise" (id. at 8); "[e]ven if Plaintiffs never saw or signed the arbitration clauses in the lenders' policies of title insurance they purchased in the real estate transactions from which all their claims arise, they are estopped from denying that they are bound by those clauses."  (FA Reply at 1); "Plaintiffs go to great lengths to argue that there is 'no valid agreement to arbitrate,' but this is a nonstarter because they are estopped from claiming that they are 'not parties to' the arbitration clause." Id. at 2.  In fact, First American's briefs acknowledge that cases that do not discuss equitable estoppel are inapposite.  See FAB Reply at 5 ("Many of the cases Plaintiffs cite to do not address equitable estoppel and thus are plainly inapposite here.").

[13]First American's failure to make this argument is not surprising since the clause refers to controversies or claims between First American and the insured, i.e. the mortgage lenders.  The clause does not mention the homeowners.

court ruled, inter alia, that DuPont was not bound to arbitrate because its claim did not assert breach of a joint venture agreement containing an arbitration provision, but rather asserted breach of a separate oral agreement to comply with the terms of the joint venture agreement.  See 269 F.3d at 201.

The decision in Chassen v. Fidelity National Financial, Inc., C.A. No. 09-291 (PGS), 2012 WL 71744 (D.N.J. Jan 10, 2012) is also unavailing.  In that case, the plaintiffs alleged the defendant title insurance companies overcharged them for recording fees.  The plaintiffs' agreements were embodied in the defendants' Closing Service Letters ("CSLs").  The CSLs incorporated the defendants' insurance policies that contained an arbitration clause.  The Court bound the plaintiffs to arbitrate, reasoning that they could not disclaim their assent to the CLSs and seek redress under their terms at the same time.  Id. at *8.  Unlike Chassen, plaintiffs are not seeking to embrace or exploit any terms in their insurance contract.

**CONCLUSION**

In summary, the Court is mindful that, at bottom, equitable estoppel is an equitable remedy. "Determining whether [the] doctrine applies is a fact specific inquiry, but generally requires an analysis of the connection between the claim, the arbitration agreement and the parties."  Hirsch, supra, at *4.  Here, no equitable considerations compel plaintiffs to arbitrate their claim.  First, plaintiffs are not seeking to exploit a term in their insurance policies but instead are seeking to assure they pay no more than the statutorily approved rate for their title insurance.  Second, plaintiffs' claim does not "flow from" their policies but instead derives from an independent source.  Third, at best, plaintiffs only received an indirect rather than a direct benefit from their policies.  The fact of the matter is that plaintiffs were compelled to buy First American's policies to benefit their mortgage

22

lenders.  Fourth, plaintiffs' claim is not inextricably intertwined with other related parties and claims that are bound to arbitration.  Plaintiffs allege they were overcharged for a title insurance policy they were compelled to buy to benefit their lenders.  The Court finds that there is nothing inequitable about requiring First American to litigate rather than arbitrate the issue of whether it charged non-signatory homeowners a statutorily permitted premium.

Accordingly, and for all the foregoing reasons, First American's Motion to Stay and Compel Individual Arbitration is DENIED.  An appropriate Order will be entered.

/s/ Joel Schneider
JOEL SCHNEIDER
United States Magistrate Judge

Dated: May 4, 2012

23