# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

|  |  |
|---|---|
| MIRIAM HASKINS, et al., | |
| Plaintiffs, | Civil No. 10-5044 (RMB/JS) |
| v. | **OPINION** |
| FIRST AMERICAN TITLE INSURANCE CO., | |
| Defendant. | |

APPEARANCES:

Daniel Posternock
McDowell Riga Posternock, PC
400 N. Church Street
Moorestown, NJ 08057
     Attorneys for Plaintiffs

Edward J. Reich
Dentons US LLP
1221 Avenue of the Americas
New York, NY 10020
     Attorneys for Defendant

**BUMB**, UNITED STATES DISTRICT JUDGE:

I. <u>Introduction</u>

     In this putative class action, Plaintiffs, New Jersey

homeowners who refinanced their home mortgages, allege in their

Amended Class Action Complaint (the "Amended Complaint") that

Defendant First American Title Insurance Company ("Defendant" or

"FA") systematically cheated New Jersey homeowners by misrepresenting the amount of money "due and owing for title insurance." (Amended Comp. at ¶ 1). Plaintiffs claim that Defendant was bound by statutory title insurance rates, but overstated those fees on their respective HUD-1 Settlement Statements[1] at closing, deceiving consumers who "ha[d] no idea how much they should be paying for title insurance," and instead relied on title insurers, like Defendant, to fill in the appropriate rates. (Id. at ¶ 42). Pursuant to this Court's prior decision on Defendant's motion to dismiss, this Court has allowed only Plaintiffs' unjust enrichment and New Jersey Consumer Fraud Act ("NJFCA") claims to proceed. (Docket No. 51).

This matter now comes before the Court upon Plaintiffs' Motion for Class Certification (Docket No. 127), pursuant to Federal Rule of Civil Procedure 23. This Court held oral argument on this motion on January 9, 2014 and received a supplemental deposition transcript submission from the parties

---

[1] The HUD-1 (HUD referring to the Department of Housing and Urban Development) Settlement Statement is a standard form used to itemize services and fees charged to the borrower by the lender or broker when applying for a loan for the purpose of buying or refinancing real estate. See http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/ramh/res/sc3sectd (last visited December 2, 2013).

following the conclusion of that hearing.[2]  For the reasons set forth below, Plaintiffs' Motion for Class Certification shall be denied.

II.  <u>Factual Background:</u>

The named Plaintiffs are homeowners who refinanced their homes: Miriam Haskins in 2005, Calvin Rogers and Harry and Mary Ellen Groover in 2007.  (Certification of Hannah Preston ("Preston Cert.") Exs. W, X & Y).  The Defendant is a national underwriter of title insurance issued in purchase and refinance transactions for both residential and commercial customers, including the named Plaintiffs.  (Certification of Lisa Aubrey ("Aubrey Cert.") at ¶ 2).  In order to proceed with their refinancing, Plaintiffs were required to purchase title insurance, which protects insured parties against losses from defects in title to real property.  (Aubrey Cert. at ¶ 2).[3]

In New Jersey, title insurance rates are regulated by law, and, pursuant to N.J.S.A. § 17:46B-42, a title insurance company

---

[2] Citations to the transcript of the January 9th hearing are indicated by "Hearing Tr."  This Court gave the parties until January 24th to provide this Court with supplemental submissions following the hearing.  Neither party has submitted any additional briefs.

[3] The only title insurance policies at issue in this case are called loan policies as they cover the mortgage lender.  (Pls.' Br. at 5).

must file with the State its "schedule of fees, every manual of classifications, rules and plans pertaining thereto . . . which it proposes to use in this State." N.J.S.A. § 17:46B-42(a). Defendant is a member of the New Jersey Land Title Insurance Rating Bureau and subject to its filed Manual of Rates and Charges ("Rate Manual"). (Aubrey Cert at ¶ 3). The Rate Manual provides for a discount (the "Discounted Rate") on title insurance for a refinance transaction when:

- The transaction is a refinance (i.e., existing loan(s) are paid off with funds from the new loan and are released at closing);
- The new loan is made to the same borrower; and
- The loan is made on the same property.

(Id. at ¶ 4 & Exs. A & B (Rate Manual §4.6.1)). Moreover, the Discounted Rate applies only to "so much of the new policy as represents the face amount of the mortgage or mortgages . . . being refinanced," and then the Basic or Standard Rate[4] applies to any amount over the amount of previous indebtedness. (Id.). In other words, the Discounted Rate would only apply to "old money" and amounts above the previous amount of the prior mortgage would be considered "new money," charged at the higher rate. (Hearing Tr. 117:10-18). In addition, the refinance rate will not apply where the prior mortgage loan was a construction

---

[4] The Basic Rate applied to transactions before March 1, 2009 and the Standard Rate to those after March 1, 2009. (Decl. of Elizabeth Fox ("Fox Decl.") at Exs. 6 & 7; Aubrey Decl. ¶ 4).

4

loan or if an existing mortgage is not both paid off <u>and</u>
released at closing. (<u>Id</u>. at ¶ 5). If a policy has enhanced
coverage under section 4.8 of the Rate Manual, such as what is
called an "Eagle Policy" by FA, than the premium is subject to
an additional surcharge of 20 percent. (<u>Id</u>. at ¶ 6). Finally,
the Rate Manual sets forth additional fees that are often
charged but that are not subject to the refinance rate, such as
fees for endorsements, title examinations, other searches and
closing service letters. (<u>Id</u>. at Ex. A & B §§ 5.1, 5.2, 5.3,
6.6, 10). Thus, the charge for the title insurance premium on
the HUD-1 Settlement Statement is not necessarily limited to the
title insurance premium, but may incorporate other charges as
well, such as search fees, examination fees and endorsements.
(Aubrey Dep. I – 50:1-11).[5]

During the proposed class period, September 29, 2004
through the date of final judgment in this case, FA sold/sells
title insurance through two different avenues: both directly
from its branch offices in New Jersey and indirectly through
authorized title agents. (Aubrey Cert. ¶ 8). These independent
agents are contracted by FA to issue policies and, pursuant to

---

[5] For example, on named Plaintiff Haskins' HUD-1 Statement, Line
1108, the total charge of $1015 includes, in addition to the
title insurance premium: an examination fee, a flood search fee,
a upper court search fee, municipal search fees, endorsement
fees, closing service letter fees, photocopying fees, notice of
settlement fees, overnight fees, email package fees, and wire
fees. (Preston Cert. Ex. W – Haskins 000332 & 000471).

such contracts, those agents must maintain records and documents from their title transactions pursuant to New Jersey law and must remit First American's portion of the title insurance premium on a monthly basis. (Fox Decl. Exs. 4 & 5; Aubrey Cert. ¶ 9). For the policies sold by FA's independent agents, FA does not learn of those policies until the agent makes his or her monthly remittance to FA. (Aubrey Cert. ¶ 9). FA maintains three different IT databases to store data related to title insurance policies issued in New Jersey.

*a) Policies Sold Directly by FA – "FAST"*

Information regarding policies sold directly by FA is stored in its "FAST" IT system, which contains, in most cases, the total premium paid (which may represent a lump sum including other charges, such as endorsements),[6] the property address, the borrower name, and lender name in the transaction. (Barney Cert. ¶¶ 3-5 & 9). The FAST system contains a field that allows for the identification of the "transaction type" – e.g., that the transaction was a refinance for transactions that closed after December 2009, prior to that date, that field was not available in the FAST system. (Barney Cert. ¶ 6). In addition, the fields in the FAST system may not capture the face amount of the prior loan and whether it was released at closing. (Barney Cert. ¶ 7).

---

[6] See footnote 5 supra.

6

The information stored in FAST, however, does not lend itself to an electronic determination of whether a transaction qualified as a refinance, even if the transaction type listed in the system is "refinance." (Barney Cert. ¶ 9; Barney Dep. 91:4-20). Merely because a transaction was listed in the FAST system as a refinance did not mean that it was, in fact, a refinance transaction or that the refinance rate applied; instead, in many instances, a review of the individual file would be needed to determine if the policy qualified for the refinance rate. (Barney Dep. 91:4-13, 16-19).[7] Moreover, files associated with FAST system data are often scanned and the images in the repository are not "searchable." (Barney Cert. ¶ 4).

---

[7] During the 30(b)(6) deposition of Karen Barney, First American's Technology Product Manager, she testified that merely because a transaction was listed in the system as a refinance did not mean that it was in fact a refinance transaction or that the refinance rate applied:

Q: This is a refinancing transaction; correct?

A: I would not say that -- for a fact.

Q: It's noted as a –

A: <u>The transaction type selected in this order is a refinance. That does not mean that it was a refinance transaction.</u>

Q: And it wasn't a refinancing – actually, it wasn't a refinancing transaction, it would just be a mistake that that it was designated as such in this particular document?

***

A: Well, we just pull whatever is in the – in that field so. So either it was actually a refinance or not, <u>you wouldn't know without reviewing the file.</u>

(Barney Dep. 91:4-13, 16-19, emphasis added).

For policies issued by the independent title agents, the vast majority of policies at issue in this case, the process is such that the agent receives the application for the title work and then processes the order. Processing includes calculating the rate to be charged and making a determination as to whether the customer is entitled to a discounted refinance premium rate as provided in the Rate Manual. (Aubrey Decl. at ¶ 9; see e.g., Berenato Decl. ¶ 17; Fitzpatrick Decl. ¶ 21; Gdovin Decl. ¶ 7; Greist Decl. ¶ 7).

b) *Policies Sold by Independent Agents – "WINGS" and "STARS"*

The electronic information related to title insurance transactions completed by FA's independent title agents is stored in two IT systems: WINGS (for policies issued prior to 2008) and STARS (for policies issued from 2008 forward). (Barney Cert. ¶ 10). The information that is input into the WINGS and STARS systems about the policy transactions depends entirely on what is remitted by the agent and can vary from agent to agent. (Barney Dep: 22:18-23:9; Dirks Dep. 37:1-13; Whippen Dep. 20:7-23). In other words, some independent agents provided more information than others to be entered into the respective systems. (Barney Dep. 23:3-9). At a minimum, the most these agents were required to provide is the state and county of the property, and the type of policy issued (e.g.,

standard or "Eagle"). (See Barney Dep. 23:10-22). Whether or not the transaction is a refinance is not a required field. (Id. 23:18-21).

Similar to the FAST system described above, the WINGS and STARS systems contain a field which may indicate whether a transaction was a "refinance," but that field does not necessarily reflect that the transaction actually qualified for the refinance rate discount under the terms of the Rate Manual. (Barney Cert. ¶ 13 & 17). Moreover, the information transmitted by independent agents that would be entered into WINGS and STARS systems does not necessarily provide data relevant to the application of the refinance rate such as whether the transaction involved the same borrowers, the same property, the type of loan, and whether the prior loan was both paid off and released at closing. (Barney Dep. 22:18-25:21; Whippen Dep. 20:2-23; Barney Cert. ¶13). Like the FAST system, the premium amount indicated in the STARS system may include other charges as allowed under HUD regulations. (Barney Dep. 98:8-20). In the WINGS system, the premium field may contain a premium calculated by the system rather than a premium actually charged by the agent. (Whippen Dep. 121:17-21).

While the information input into these systems vary, the FAST, WINGS and STARS systems have rate calculators that "calculate premiums." (See Whippen Dep. 40:9-15 (WINGS); Dirks

Dep. 43:8-14 (STARS) & Barney Dep. 62:7-22 (FAST)).  Based on these calculations, FA engages in a process to perform reconciliations on its agents' remittances to check premium calculations and resolve variances between the amounts charged and the amounts remitted by the independent agents.  (Dirks Dep. 14:5-20).

The rate calculators, however, are not designed to determine whether the requirements for the refinance rate per the Rate Manual were met and whether such rate was properly applied;[8] again, the independent agents determine whether the requirements for the refinance rate were satisfied. (Aubrey Decl. at ¶ 9; see e.g., Berenato Decl. ¶ 17; Fitzpatrick Decl. ¶ 21; Gdovin Decl. ¶ 7; Greist Decl. ¶ 7).[9]  Instead, to ensure compliance of its agents with the Rate Manual, FA conducts random audits of agent files.  (Deposition of Carolyn Bouffard, "Bouffard Dep." 14:4-20).  This audit process involves a manual review of the underlying agent files to "determine what type of transaction it was, was it a purchase or refinance, [and to] determine what rate structure was used."  (Deposition of Edward Foma 14:13-17).  Where overcharges were determined via this

---

[8] It became clear during oral argument that Plaintiffs fundamentally misunderstood this process.  See further discussion at page 25 infra.

[9] See also Dirks Dep. 18:4-5 (stating that where a variance in the calculations occurred it may have been because the agent "[d]idn't' give us the appropriate rate type.").

audit process, agents were directed to provide a refund.

(Bouffard Dep. 33:17-34:11; Licata Decl. Exs. A & B).

Pursuant to the above facts, the Plaintiffs in this matter propose the following class definition:

> All homeowners in New Jersey who, during the period September 29, 2004 through the date of judgment (the "Class Period"):
>
> (1) refinanced a home mortgage on the same property already covered by a mortgage;
>
> (2) paid a lenders' title insurance premium to First American Title Insurance Company, directly or indirectly; and
>
> (3) either:
>
>> (A) Paid a premium that exceeded the Minimum Possible Premium by at least $25, in a refinancing transaction for which First American's electronic records do NOT show that the premium charged was the mandated amount under the New Jersey Manual of Rates and Charges (the "Rate Manual"). The Minimum Possible Premium is the premium that would have been charged if the Refinance Rate were applied to the entire loan amount for purposes of calculating the premium[;]
>>              OR
>> (B) Paid a premium that exceeded the Minimum Possible Premium by at least $250;
>>              OR
>> (C) Purchased title insurance from First American or a subsidiary of First American, as opposed to a nonemployee or independent title agent, and paid a premium that exceeded the Minimum Possible Premium by at least $25.

(Pls.' Br. at 3-4).

The named Plaintiffs contend that they are part of the proposed class because they were overcharged by FA on their

title insurance premiums.  More specifically, Plaintiff Haskins

avers her title insurance transaction should have cost her $480,

but she was charged $511; the Rogers' transaction cost $593, but

they contend it should have cost $366; finally, Plaintiff

Groover's transaction cost $661.50, but he claims it should have

cost $393.


   III. <u>The Applicable Standard</u>:

   It is a plaintiff's burden to demonstrate that a class

action is a proper vehicle for a lawsuit.  <u>Hayes v. Wal-Mart</u>

<u>Stores, Inc.</u>, 725 F.3d 349, 354 (3d Cir. 2013)(citing <u>Comcast</u>

<u>Corp., v. Behrend</u>, 133 S. Ct. 1426 (2013)).  "The class action

is an exception to the usual rule that litigation is conducted

by and on behalf of the individual named parties only." <u>Marcus</u>

<u>v. BMW of North America, LLC</u>, 687 F.3d 583, 592-93 (3d Cir.

2012)(quoting <u>Wal-Mart Stores v. Dukes</u>, 131 S. Ct. 2541, 2550

(2011)).  In order to invoke this exception and proceed as a

class action, the four requirements of Federal Rule of Civil

Procedure 23(a) and the requirements of either Rule 23 (b)(1),

(2), or (3) must be met.

> To satisfy Rule 23(a)[:] (1) the class must be "so numerous
> that joinder of all members is impracticable" (numerosity);
> (2) there must be "questions of law or fact common to the
> class" (commonality); (3) "the claims or defenses of the
> representative parties" must be "typical of the claims or
> defenses of the class" (typicality); and (4) the named
> plaintiffs must "fairly and adequately protect the

interests of the class" (adequacy of representation, or simply adequacy).

Marcus, at 590-91 (citing In re Cmty. Bank of N. Va., 622 F.3d 275, 291 (3d Cir. 2010)); See Fed. R. Civ. P. 23. Moreover, Rule 23 (b)(3), the basis for certification in the instant matter, "requires that (i) common questions of law or fact predominate (predominance), and (ii) the class action is the superior method for adjudication (superiority)." Id.

"Class certification is only proper 'if the trial court is satisfied, after a rigorous analysis, that the prerequisites' of Rule 23 are met." Hydrogen Peroxide, 552 F.3d at 309 (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 161 (1982)). When performing this rigorous analysis, "the court cannot be bashful. It 'must resolve all factual or legal disputes touching on elements of the cause of action.'" Marcus, 687 F.3d at 591 (quoting Hydrogen Peroxide, 552 F.3d at 307), and, "[f]requently, that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. '[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" Dukes, 131 S. Ct. at 2551-52 (alteration in original)(quoting Falcon, 457 U.S. at 160). In addition, "[f]actual determinations supporting Rule 23 finings must be made by a preponderance of the evidence, and the

burden of proof rests on the movant." <u>Hayes</u>, 725 F.3d at 354 (internal quotations and citations omitted).

Before even considering the requirements of Rule 23(a) and Rule 23(b), however, it is "an essential prerequisite" to class certification for the Plaintiffs to show by a preponderance of the evidence that the proposed class is "currently and readily ascertainable based on objective criteria." <u>Marcus</u>, 687 F.3d at 592-93. The same rigorous analysis standards that apply to Rule 23 findings apply to the question of ascertainability.[10] <u>Carrera v. Bayer Corp.</u>, 727 F. 3d 300, 306 (3d Cir. 2013). "A Plaintiff may not merely propose a method of ascertaining a class without evidentiary support that the method will be successful." <u>Id</u>. If the Court cannot ascertain the class in an economical and administratively feasible manner, the "significant benefits of a class action are lost." <u>Id</u>. at 307. In other words, "[i]f class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class

---

[10] The Court must apply a rigorous analysis to ascertainability because of the key role it plays in a Rule 23(b)(3) class actions:

> First, at the commencement of a class action, ascertainability and a clear class definition allow potential class members to identify themselves for purposes of opting out of a class. Second, it ensures that a defendant's rights are protected by the class action mechanism. Third, it ensures that the parties can identify class members in a manner consistent with the efficiencies of a class action.

<u>Carrera</u>, 727 F.3d at 307.

action is inappropriate." <u>Marcus</u>, 687 F.3d at 593.  Moreover,

"[s]ome courts have held that where nothing in company databases

shows or could show whether individuals should be included in

the proposed class, the class definition fails."  <u>Id</u>.

As put plainly by the Third Circuit: "Th[e] petition for

class certification will founder if the only proof of class

membership is the say-so of putative class members or if

ascertaining the class requires extensive and individualized

fact-finding."  <u>Hayes</u>, 725 F.3d 356 (internal citations

omitted).  "In sum, to satisfy ascertainability as it relates to

proof of class membership, the plaintiff must demonstrate his

purported method for ascertaining class members is reliable and

administratively feasible, and permits a defendant to challenge

the evidence used to prove class membership."  <u>Carrera</u>, 727 F.3d

at 308.


IV.  <u>Analysis</u>

Plaintiffs support their putative class definition through

the presentation of expert reports by Abraham Wyner, Ph.D., a

statistician [Docket No. 128-3], and Michael Pakter, a Certified

Public Accountant [Docket Nos. 129 & 153-12], which they aver

demonstrate that FA's WINGS, STARS, and FAST databases have "in

electronic form, all of the necessary information needed to

calculate and verify premiums in accordance with the New Jersey

Rate Manual." (Pls.' Reply Br. at 1). In those instances where particular pieces of information necessary to calculate the mandated premium are missing from the databases, Plaintiffs contend that the information can be efficiently obtained from other sources. (Pls.' Br. at 2).

Dr. Wyner's analysis draws data from three tables representing a sample of title insurance transactions, pulled from the WINGS, STARS and FAST databases. (Wyner Rep. at ¶ 2). From this data, Wyner selected a random sample of loans and "implemented a formula to compute the premium for refinance using the Rate Manual."[11] (Id. at ¶¶ 7 & 19). Wyner then applied this formula to a sample from the FAST database and determined that FA overcharged the refinances at a rate of 84.65 percent. (Id. at ¶¶ 27 & 28). In calculating this formula and reviewing the sample, Dr. Wyner noted that: "[i]t is economically impossible to locate and check each and every one of the files that correspond to each and every refinanced loan in the population to determine exactly how many loan owners have been overcharged for title insurance." (Id. at ¶ 5).

Reviewing FA's WINGS, STARS and FAST databases, Plaintiffs' database expert, Mr. Pakter, stated in his report that he has found "thousands" of instances where putative class members were charged a rate in excess of that prescribed by the Rate Manual.

---

[11] Hereinafter the "Wyner Formula."

(Pakter Rep. at pp. 27-28).  The calculations underpinning Mr.

Pakter's conclusions include an analysis of Dr. Wyner's sample

from the FAST system wherein Mr. Pakter calculated overcharges

of title insurance premiums by using four data elements:

- Liability Amount;
- Liability Date;
- Premium Charged; and
- Prior Loan Amount.

(Pakter Rep. at p. 9).

The Prior Loan Amount, is not available from FA's data;

Instead, Mr. Pakter obtained the necessary figures from LEXIS

NEXIS public records.  (Pakter Rep. at p. 11, ¶ 4; Hearing Tr.

81:22-82:9).  Using these data elements, Mr. Pakter determined

that "of the 202 refinance transactions included in the Wyner

Sample, 157 transactions were overcharges of title insurance

premium not less than $25."  (Id. at p. 27).[12]  With respect to

---

[12] With respect to the FAST database overall, Pakter also
concluded that:

- There are 6,730 transactions in the FAST Database with
  potential overcharges not less than $25 using the Refinance
  Rates for refinance transactions for which the FAST
  Database contained no and/or a zero Prior Loan Amount.

- There are 2,119 transactions in the FAST Database, listing
  both the Liability Amount and the Premium Charged, with
  potential overcharges not less than $250 using the
  Refinance Rate (assuming no New Money) for all refinance
  transactions in the FAST Database.

- There are 6,730 transactions in the FAST Database with
  potential overcharges not less than $25 using the Refinance
  Rates for refinance transactions for which the FAST
  Database contained no and/or a zero Prior Loan Amount.

17

the prior loan amounts, Mr. Pakter assumed that outstanding

portions of a "Prior Loan Amount" were paid off as part of the

refinancing. (Id. at p. 14, ¶10). He also assumed that the

LEXIS NEXIS public records were accurate. (Id. at p. 12, ¶15).

Mr. Pakter also reviewed the named Plaintiffs' transactions and

determined that:

- Miriam Haskins was overcharged $31 for her title insurance;
- Calvin Rogers was overcharged $227 for his title insurance; and
- Mary and Harry Groover were overcharged $269 for their title insurance.

(Id. at p. 27, Conclusions 2-4). Finally, Mr. Pakter reviewed

the WINGS and STARS databases and found there to be tens of

thousands of overcharges of title insurance premiums. (Id. at

pp. 27-28).[13]

---

(Pakter Rep. at pp. 27-28, Conclusions 7, 10 & 13).

[13] More specifically, he determined that:

- There are 2,272 transactions in the WINGS Database with overcharges not less than $25 using the Wyner Formula for refinance transactions for which the WINGS Database contained all Four Data Points.

- There are 7,631 transactions in the STARS Database with overcharges not less than $25 using the Wyner Formula for refinance transactions for which the STARS Database contained all Four Data Points.

- There are 1,400 transactions in the WINGS Database with potential overcharges not less than $25 using the Refinance Rates for refinance transactions for which the WINGS Database contained no and/or a zero Prior Loan Amount.

- There are 57 transactions in the STARS Database with potential overcharges not less than $25 using the Refinance

18

Based on all of his calculations and assumptions, Mr. Pakter concluded that it is feasible to produce a "master database" containing the four data elements for each transaction. (Id. at pp. 24 & 28). Where prior loan amounts are not available from FA's databases, Mr. Pakter proposes to obtain and verify those amounts from LEXIS NEXIS, which he admits would take about six to twelve minutes per transaction. (Id. at pp. 24 & 26). The spreadsheet containing the information would be "used to apply the Wyner Formula to determine the extent and amount of overcharges." (Id.)

In response, the Defendant maintains that its IT databases do not contain the necessary information to identify class members and accurately calculate rate overcharges, if any. Instead, the Defendant argues that a file-by-file review of the transactions would be necessary to determine whether the appropriate rate was charged. In support of its position,

Rates for refinance transactions for which the STARS Database contained no and/or a zero Prior Loan Amount.

- There are 5,784 transactions in the WINGS Database, listing both the Liability Amount and the Premium Charged, with potential overcharges not less than $250 using the Refinance Rate (assuming no New Money) for all refinance transactions in the WINGS Database.

- There are 5,137 transactions in the STARS Database, listing both the Liability Amount and the Premium Charged, with potential overcharges not less than $250 using the Refinance Rate (assuming no New Money) for all refinance transactions in the STARS Database.

Defendant has submitted the expert report of Bruce Strombom, Ph.D., an economist, which determines, _inter alia_, that Mr. Pakter's analysis relies on incorrect assumptions and calculations. He also concludes that the use of sampling, as employed by Dr. Wyner, "cannot identify individual members of a class or determine the amount by which each was overcharged, or whether they were overcharged at all." (Strombom Rep. at ¶ 64).

Again, qualifying for the Refinance Rate in the Rate Manual requires that the loan: 1) be made to the same borrower; 2) on the same property as the loan being refinanced; and that the prior loan 3) cannot be a construction loan, and 4) must be paid off as part of the transaction (i.e., released). (_See_ Strombom Rep. at ¶ 22). To determine whether a person who qualifies for the refinance rate has been overcharged, and to calculate that overcharge, one must know "the liability amount of the new policy, the type of policy (standard or enhanced/Eagle), the date of the policy (given the changes in the applicable rates over time) and the original principal amount of the extinguished loan(s)." (Strombom Rep. at ¶ 20).

Because FA's FAST system does not identify the borrower of the prior loan, does not establish that the prior loan was not a construction loan, and does not definitively establish that a prior loan was paid off, and not merely paid down, Strombom concludes that the information in the FAST system does not

contain the necessary information to determine whether a transaction meets the refinance rate criteria. Moreover, the values recorded in the Premium Amount field in FAST may include charges other than the underwriting fee, so Strombom determined that merely subtracting the correct underwriting fee from the amount recorded in the Premium Amount field will not necessarily yield an accurate result. (Strombom Rep. at ¶ 32).

With respect to FA's WINGS and STARS systems, Strombom points out that the critical data points of "the identity of the borrower of the prior loan, whether the premises have been altered, whether the prior loan was a construction loan, or whether the prior loan was paid off and not merely paid down" are not available in those systems. (Strombom Rep. ¶ 39). Moreover, WINGS and STARS do not contain the address of the property and names of borrowers, making a search of LEXIS NEXIS records impossible for these systems. (Strombom Rep. ¶ 40). In addition, the premium field in STARS may include fees other than the premium amount, such as endorsements, that may prevent accurate identification of overcharges. (Id. at ¶ 41). Relatedly, the WINGS premium amount field may contain a record of an amount other than that paid by the customer, which would similarly preclude an accurate determination of whether an overcharge occurred. (Id. at ¶ 42).

In reviewing Mr. Pakter's calculations, Dr. Strombom reviewed, _inter alia_, a specific subset of 35 transactions that appear on one or more of Mr. Pakter's lists of overcharges in WINGS and STARS. (_Id_. at 45). Of this set of 35, Strombom received 34 files and had completed a review of 29 of those files as of the time of his written report. From this review, he determined that Mr. Pakter was incorrect in calculating an overcharge for 22 of those 29 files, and the amount of the overcharge was overstated in 3 additional instances, making Mr. Pakter incorrect by 86 percent per Strombom's review of that sample. (_Id_. at 46). As of oral argument in this case, Strombom had completed his review of all 36 files and found an error rate of approximately 94 percent. (Hearing Tr. 111:9-19). As a result of his overall review, Dr. Strombom concluded that an individual file review is required to determine the amount of overcharge, if any, and that "it would not be feasible to construct a master database to calculate overcharges for the entire population of refinance transactions." (Strombom Rep. at p. 3).

The Court will explore the experts' respective conclusions in more detail below as they pertain to both the ascertainability of the class and the commonality and predominance requirements of Rule 23.

**A) Ascertainability**

The proposed class in this matter raises serious ascertainability issues that require this Court to deny Plaintiffs' motion for class certification. This determination is based, in large part, on this Court's findings with respect to the conclusions of the parties' experts. In <u>Marcus</u>, the Third Circuit discussed at length the Court's obligations as related to expert testimony in the class certification context:

> We explained [in <u>In re Hydrogen Peroxide Antitrust Litigation</u>, 552 F.3d 305] that . . . <u>"[w]eighing conflicting expert testimony at the certification stage is not only permissible[, but] it may be integral to the rigorous analysis Rule 23 demands</u>," especially when a party opposing certification offers its own competing expert opinion. <u>Id</u>. We further assured district courts that "[r]igorous analysis need not be hampered by a concern for avoiding credibility issues." <u>Id</u>. at 324.

687 F.3d at 601-02 (emphasis added).[14] In other words, in the class certification context, this Court is called upon to evaluate the proffered competing testimony of the parties' respective experts and make a determination as to whether the plaintiffs have properly demonstrated that the proposed class is "readily ascertainable based on objective criteria." <u>Agostino v. Quest Diagnostics Inc.</u>, 256 F.R.D. 437, 478 (D.N.J. 2009).

---

[14] This Court has held oral argument in this matter on the conflicting expert testimony based, in part, on the dictates of <u>Marcus</u>, where the Third Circuit noted that it would have preferred a "more explicit discussion and comparison," of the competing expert testimony by the District Court to "aid . . . appellate review." 687 F.3d at 603.

As further explained below, Plaintiffs have not met this burden.[15]

The central dispute in this matter centers on whether the data contained in the Defendant's relevant databases – i.e., FAST, WINGS and STARS – is sufficient to determine both the members of the putative class and calculate their attendant overcharges or whether a file-by-file review of the relevant transactions would be necessary to make the required determinations. In support of their contention that the information needed to identify the class members and calculate damages exists in FA's FAST, WINGS and STARS databases, Plaintiffs cite several portions of testimony by FA's 30(b)(6) witnesses about FA's use of rate calculators. For example, they quote the deposition testimony of Angelika Whippen, FA's 30(b)(6) witness related to FA's IT systems, who testified that the WINGS system contains a rate calculator to: "confirm [that the premium] is correct and calculate the premium." (Whippen

---

[15] During oral argument, Plaintiffs made overtures about what future discovery might potentially show with respect to their class certification argument. This Court is obliged, however, to rule on this motion for class certification based on what the Plaintiffs can currently demonstrate based on the extensive discovery already conducted. See Carrera, 727 F.3d at 311 ("assurances that a party 'intends or plans to meet the requirements' are insufficient to satisfy Rule 23."). Moreover, there has been no indication that any further discovery would be fruitful in this regard. Defendant has clearly demonstrated that its databases lack the information required to construct Plaintiffs' proposed master database without a file-by-file review.

Dep. 40:9-15).  They quote similar testimony from FA's Paul

Dirks about the STARS system: "We entered those basic data

elements into the system which would calculate the rate," (Dirks

Dep. 43:8-14), and testimony from Karen Barney about the rate

calculators in the FAST system.  (Barney Dep. 62:22).

From this testimony, Plaintiffs extrapolate that FA's

process of routinely checking the remittance data from its

agents to ensure FA was receiving the proper premiums confirms

that FA's electronic data as contained in WINGS, STARS and FAST

is both complete and reliable to determine whether FA

overcharged putative class members and to what extent those

class members were overcharged.  Where admitted gaps in

necessary information exist, Plaintiffs contend those gaps can

be easily filled through LEXIS NEXIS public records database.[16]

In response, FA demonstrates that Plaintiffs fundamentally

misunderstand the rate calculators and its process of checking

remittances: the checking of accuracy of agents' remittances

confirms <u>not</u> whether the requirements of the refinance rate were

satisfied,[17] but rather confirms whether the agent remitted the

---

[16] In Plaintiffs' Reply Brief, they also discuss filling gaps
with "adverse inferences against FA under the spoliation
doctrine."  (Pls.' Reply Brief at 11.).  As there has been no
briefing on, much less a finding of spoliation, this Court will
reject this argument outright without further discussion.

[17] <u>See</u> refinance rate requirements per the Rate Manual on page 4
<u>supra </u>and 28 <u>infra</u>.

correct premium split (i.e., the agent's share compared to FA's share) and whether the premium reported by the agent is consistent with the liability amount, endorsements, <u>and rate the agent says he or she applied</u>. (Dirks Dep. 18:4-5)(stating that where a variance occurs it may be because the agent "[d]idn't' give us the appropriate rate type.").[18]  The independent agents determine whether the refinance rate applies. (Aubrey Decl. at ¶ 9; <u>see</u> <u>e.g.</u>, Berenato Decl. ¶ 17; Fitzpatrick Decl. ¶ 21; Gdovin Decl. ¶ 7; Greist Decl. ¶ 7).

Following oral argument, the Court requested the entirety of Mr. Dirks' deposition to further clarify this point.  A full review of that deposition solidifies this Court's view that Plaintiffs distort the purpose of the rate calculators and misread Mr. Dirks' testimony.  Plaintiffs lean on Mr. Dirks statement at deposition that, "We entered those basic data elements into the system which would calculate the rate[,]" [Dirks Dep. 43:9-11], for the proposition that "[t]he only possible thing that means is that enough information is obtained in order to calculate the premium."  Hearing Tr. 165:9-10.

The record, including Mr. Dirks' deposition, is clear, however, that the rate calculators do not determine whether a transaction qualifies for the refinance rate and/or whether the

---

[18] "[W]hat First American is verifying is that the money we received is a proper portion of the split of premium that the agent charged."  (Hearing Tr. 94:16-18).

agent properly calculated the premium based on that rate.

Instead, the purpose of the rate calculators was to determine

whether the information entered into the system matches what is

provided by the agents (i.e., their cut of the premium versus

FA's). This is made clear by Mr. Dirks' testimony regarding

what the basic elements are that form the basis of the

calculations are – i.e., policy number, an agent file number,

amount of insurance or liability amount, policy effective date,

**rate type or the rate used** and also any endorsements, fees

and/or taxes that were part of the transaction. (Dirks Dep.

12:9-18)(emphasis added). These elements are most certainly <u>not</u>

the same as the four data points needed to properly calculate

the refinance rates at issue, as testified to by Plaintiff's

expert, Mr. Pakter – i.e., Liability Amount, Liability Date,

Premium Charged, and Prior Loan Amount.[19]

---

[19] This Court denied the Plaintiffs' request made at oral
argument to take another 30(b)(6) of Mr. Dirks on the issue of
"what are the 'basic elements' that Mr. Dirks referred to in his
deposition when he said we entered the basic element and then we
come up with the calculation." (Hearing Tr. 183:1-5). A review
of Mr. Dirks' original deposition reveals why additional
discovery on this issue is unnecessary: In that deposition,
Dirks unequivocally testified as to what these basic elements
are – "We have a policy number, an agent file number, amount of
insurance or liability amount, policy effective date, rate type
or the rate used and also any endorsements, fees and/or taxes
that were part of the transaction." Dirks Dep. 12:9-18.

As discussed above, the documents remitted by FA's agents
vary under the circumstances, though sometimes contain limited
information such as the liability amount, date, policy number,
and, sometimes, rate applied.  This is not to say that FA does
not conduct checks to determine whether an agent has applied the
proper rate if a client qualifies for the refinance rate.
Again, as discussed above, FA uses an audit program to ensure
its agents' compliance with the rates set forth in the Rate
Manual.  Plaintiffs incorrectly assume that the when FA checks
remittances for accuracy, it determines whether the transaction
qualified for the refinance rate under the Rate Manual and
whether that rate was properly charged.

Plaintiffs' faulty assumptions extend to the contents of
their expert reports and their proposed method for ascertaining
class members.  Dr. Strombom's report demonstrates that Mr.
Pakter relied on incorrect assumptions in making his
calculations.  Again, it is undisputed that several conditions
must be met in order to qualify for the refinance rate as
contained in the relevant Rate Manual:

- The transaction must be a refinance (i.e., existing loan(s)
  are paid off with funds from the new loan and are released
  at closing);
- The new loan must made to the same borrower; and
- The loan must be made on the same property.

Id. at ¶ 4 & Exs. A & B (Rate Manual §4.6.1).  In addition, the
discount rate applies only to the face amount of the mortgage or

mortgages being refinanced, and then the Basic or Standard Rate applies to any "new money." (Id.). The refinance rate will not apply where the prior mortgage loan was a construction loan or if an existing mortgage is not both paid off and released at closing. (Id. at ¶ 5).

As demonstrated by the clear and cogent analysis provided by the reports and testimony of Dr. Strombom, Mr. Pakter incorrectly assumed that the transactions identified in FAST as a "refinance" necessarily qualified for the refinance rate. (Strombom Rep. at ¶ 24; Pakter Dep. 63:4-6 "I have assumed that transactions designated by First American in its databases should be accounted for using a refinance rate.").[20] The FAST system, however, does not contain the original principal amount of the prior loan, which is needed to determine whether a transaction qualifies for the refinance rate. (Strombom Rep. at ¶ 36). Strombom also points out that Pakter's use of LEXIS NEXIS to fill in the missing information from the FAST database is problematic per a disclaimer in the LEXIS NEXIS public

---

[20] At oral argument, Mr. Pakter confirmed this assumption:

Q: For purposes of your analysis you just assumed that any transaction denoted or – as a refinance in First American's FAST, STARS, or WINGS data in fact qualified for the refinance premium discount; is that right?

A: Yes. . . . I assumed it because the accounting database says it's a refinance.

(Hearing Tr. 58:13-59:5).

records database which states, in relevant part: "[b]efore relying on any data this system supplies, it should be independently verified." (Strombom Rep. at ¶ 31).[21] Moreover, Strombom's conclusion about the calculation problems presented by the "Premium Amount" field in the FAST database, which may include other charges such as endorsements, are seemingly verified by Mr. Pakter in his deposition when he acknowledged that the inclusion of other charges in the Premium Amount field "may change some of the calculations." (Pakter Dep. 113:1-7).

Dr. Strombom similarly persuades this Court that the data missing from the WINGS and STARS system requires an individual file-by-file review to determine whether the transactions qualified for the refinance rate and whether there was an overcharge. An illustrative example, employed by Dr. Strombom, pertains to Ms. Haskins, one of the named Plaintiffs, who contends that she was overcharged when FA charged her $511 instead of $480. (Pls.' Br. at p. 10). A review of her transaction, however, reveals that an actual review of her file is necessary to determine the appropriate premium amount. In her deposition, Lisa Aubrey noted that she needed to see additional documents from Ms. Haskins' file to make a proper

---

[21] Strombom further pointed out that in making his calculations, he "found a significant number, I think it was about 30 percent, where our review of the LEXIS records indicated a different conclusion than Mr. Pakter came to by his review of the LEXIS system." (Hearing Tr. 124:2-8).

rate determination. (Aubrey Dep. II – 18:2-14). Per a note in the margin of a document in the file it appeared that Ms. Haskins had a loan that was paid down at closing at the time of her refinance, but was not completely paid off and released until later, thus rendering it ineligible for consideration in applying the refinance rate, and rendering the charged $511 the correct amount. (Preston Cert. Ex. W; Aubrey Dep. II – 21:15-25, 148:22-150:13). Notably, Ms. Aubrey stated that she would need more documentation to confirm her conclusion. (Aubrey Dep. II – 21:8-22:1).

Mr. Pakter's Supplemental Expert Report fails to effectively refute the problems identified by Dr. Strombom and during oral argument, Mr. Pakter admitted that he did not review the underlying files that were reviewed by Dr. Strombom to determine if the transactions at issue qualified for the discounted rate.[22] Instead, Mr. Pakter quotes the testimony from FA's 30(b)(6) witnesses about FA's database calculators and FA's process for checking agents' remittances. That testimony, however, for the reasons already discussed above, does not support the Plaintiffs' contention that FA's databases are

---

[22] Q: And you reviewed these files to determine if these transactions qualified for the discounted rate?
A: I never reviewed anything for eligibility or qualification. (Hearing Tr. 76:15-18; 84:21 ("I did not go to the underlying file")).

sufficient and complete to determine whether a transaction qualified for the refinance rate and if there was an overcharge in that particular transaction.  See discussion at pp. 25-26 supra.  Moreover, Mr. Pakter's Supplemental Report admits that he rechecked his analysis and had to make corrections for some errors identified by Dr. Strombom: "Strombom asserts that my analyses of the FAST database incorrectly eliminated line items. . . . I rechecked my analysis and corrected those line items." (See Pakter Supp. Rep. at p. 16).  Mr. Pakter also conducted additional analysis and decreased his numbers for several of his results from the FAST, WINGS and STARS databases in his Supplemental Report.  (Id. at p. 17).

During oral argument, Mr. Pakter acknowledged that the databases at issue lack the information necessary to make the calculations at issue:

> Q: After determining that a transaction qualifies for the refinance premium rate discount under the terms of the Rate Manual, you agree that one needs three different points of data to calculate a premium, the liability amount, the liability date, and the prior loan amount, correct?
> A. Correct.
> Q. Okay. And there is no data in FAST in the spreadsheet that you analyzed that shows a prior loan amount. That's what you testified to, right?
> A. Correct.
> Q. And isn't it true that not all STARS and WINGS transactions have data indicating the prior loan amount?
> A. There are some that have a blank field there. There were some line items with a blank field.

(Hearing Tr. 63:6-20).

Perhaps most troubling, however, for purposes of the instant motion for class certification is Mr. Pakter's statement in his Supplemental Report: "[w]ith regard to particular analyses that I performed at the request of Legal Counsel, my focus was on potential, not actual overcharges. In connection with these analyses, any criticism that I failed to identify actual overcharges is beside the point." (Id. at p. 18). Whether the Plaintiffs have presented evidentiary support that they have the ability to accurately identify actual class members, is, however, exactly the point of this Court's analysis. See Carrera, 727 F. 3d at 306 ("A Plaintiff may not merely propose a method of ascertaining a class without evidentiary support that the method will be successful."). Plaintiffs' inability to meet this burden was bolstered by the testimony of their own expert at oral argument:

> Q: So in your original report you provided potential overcharges, not actual overcharges, at least with regard to those several queries you mentioned; is that correct?
> A. The queries are all potential overcharges.
> Q. Why?
> A. Because I would need an additional process and/or data to determine if it was an actual overcharge.

(Hearing Tr. 87:14-20).

Like Mr. Pakter's conclusions, Dr. Wyner's "formula" is similarly hampered by faulty assumptions. (See Wyner Dep. 104:7-9 "the calculation depends on the accuracy of the data that goes into it."). As admitted in his deposition, the data employed by Dr. Wyner was incorrectly assumed to have met the refinance rate requirements, (Wyner Dep. 104:2-9), and it was also incorrectly assumed that each prior loan at issue counted towards the Rate Manual discount. (Wyner Dep. 93:15-94:18). Dr. Wyner admitted that his formula does not determine whether the qualifications for the refinance rate have been met: "to the best of my knowledge, it's not available in the data tables. And so, therefore, other places must be searched." (Wyner Dep. 130:16-131:23).

This Court's findings as to the parties' experts, coupled with the Defendants' demonstration of how the Plaintiffs' proposed methods fail, are fatal to Plaintiffs' petition for class certification. See Carrera, 727 F.3d at 306 ("A Plaintiff may not merely propose a method of ascertaining a class without evidentiary support that the method will be successful."). Based on the evidence presented at this juncture, it appears that Plaintiffs' plan to construct an accurate master database is not possible. Importantly, FA is not required to keep records for class certification purposes. See Hayes, 725 F. 3d at 356 ("the nature or thoroughness of a defendant's

recordkeeping does not alter the plaintiff's burden to fulfill Rule 23's requirements. . . Rule 23's requirements that the class be administratively feasible to ascertain and sufficiently numerous to warrant class action treatment cannot be relaxed or adjusted on the basis of [plaintiffs'] assertion that [defendant's] records are of no help[.]").  Moreover, Plaintiffs' hope to fill-in the missing information is too speculative and unreliable to support a finding in favor of class certification.  See Carrera, 727 F.3d at 311 ("assurances that a party 'intends or plans to meet the requirements' are insufficient to satisfy Rule 23.").

As stated by Plaintiffs' expert, Dr. Wyner: "[i]t is economically impossible to locate and check each and every one of the files that correspond to each and every refinanced loan in the population to determine exactly how many loan owners have been overcharged for title insurance."  (Wyner Rep. at ¶ 5). Thus, the Plaintiffs have failed to meet their burden to demonstrate that they can reliably or efficiently identify class members and class certification is improper.  Marcus, 687 F.3d at 592-93 (discussing plaintiffs burden to show by a preponderance of the evidence that the proposed class is "currently and readily ascertainable," and that a class action is inappropriate "[i]f class members are impossible to identify

without extensive and individualized fact-finding or 'mini-trials[.]'") (emphasis added).[23]

Other courts have made similar determinations with respect to class certification and FA's records. See Boucher v. First American Title Ins. Co., No. 10-199, 2012 U.S. Dist. LEXIS 102904, * 12-18 (W.D. Wash., July, 24 2012)(holding that the plaintiffs did not show they could identify potential class members using FA's FAST and STARS systems and that the class members' claims required an individualized review of evidence).

### B) Commonality and Predominance

Even assuming, arguendo, that the Plaintiffs had satisfied this Court as to ascertainability, this Court would, nevertheless, decline to certify the proposed class as Plaintiffs cannot satisfy the requirements of Rule 23(b)(3).[24]

---

[23] Mr. Pakter confirmed this Court's conclusion as to the need for a file-by-file review during oral argument:

> Q: Am I to understand your testimony that when you say that there is a potential overcharge, that you need to do more work to determine whether there was an actual overcharge?
>
> A: Yes.
>
> Q: And that would be either what, to go to the files to review whether or not it was a proper refinance, and things of that nature?
>
> A: Yes. It could be a multiple of steps depending on the exception that I'm seeing.

(Hearing Tr. 70:17-71:1).

[24] Because class certification fails on multiple grounds, this Court need not reach the issues of numerosity, typicality or adequacy. See Dukes, 131 S. Ct. at 2251, n. 5 ("In light of our

Commonality under Rule 23(a) requires the Plaintiffs to demonstrate that their claims depend upon a common contention. <u>Dukes</u>, 131 S. Ct. at 2551. "That common contention, moreover, must be of such a nature that it is capable of classwide resolution––which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims <u>in one stroke</u>." <u>Id.</u> (emphasis added). In other words, what matters to class certification is not the raising of common questions "but, rather the capacity of a classwide proceeding to generate common <u>answers</u> apt to drive the resolution of the litigation." <u>Id</u>. (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 132 (2009)).

In addition to the requirements of Rule 23(a), the Plaintiffs in this case must also satisfy the predominance requirement of Rule 23(b)(3). Pursuant to Rule 23(b)(3), a class action may only be maintained if:

> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to

---

disposition of the commonality question . . . it is unnecessary to resolve whether respondents have satisfied the typicality and adequate-representation requirements of Rule 23(a)"); <u>Eastman v. First Data Corp</u>., No. 10-4860, 2013 U.S. Dist. LEXIS 107163 at *29 (D.N.J. July 31, 2013) ("Because of the lack of commonality, the Court need not reach the other Rule 23(a) questions of typicality and adequacy of representation or Rule 23(b).").

> other available methods for fairly and efficiently
> adjudicating the controversy.

Fed. R. Civ. P. 23(b)(3). "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." <u>Comcast</u>, 133 S. Ct. at 1432. Where, as in this matter, "an action is to proceed under Rule 23(b)(3), the commonality requirement [of Rule 23(a)] is subsumed by [Rule 23(b)(3)'s] predominance requirement." <u>Danvers Motor Co., Inc. v. Ford Motor Co.</u>, 543 F.3d 141, 148 (3d Cir. 2008) (internal quotations and citations omitted). Thus, this Court will focus its analysis on the whether the Plaintiffs have satisfied Rule 23(b)(3)'s requirements -- namely, whether "the element of [their legal claims are] capable of proof at trial through evidence that is common to the class rather than individual to its members." <u>Hydrogen Peroxide</u>, 522 F.3d at 311-12.

As discussed at length above with respect to ascertainability, the files from each putative class member's transaction would need to be examined to determine whether a new loan was used to refinance a prior mortgage and whether the transaction involved the same borrowers, the same property, the amount of the prior loans, and the disposition of those loans per the requirements of the Rate Manual. Even Plaintiffs' expert concedes that FA's systems lack some of the requisite information. (<u>See</u> <u>e.g.</u>, Pakter Dep. 105:18-22; Hearing Tr.

80:12-82:9).[25]  The need to cull information that is not
available electronically on a classwide basis in order to
determine whether there was an overcharge and, if so, how much,
renders this matter unsuitable for class certification.  Other
title insurance cases against Defendant have met a similar fate.
See <u>Loef v. First American Title Ins. Co.</u>, No. 08-311, 2012 U.S.
Dist. LEXIS 174313, at *17 (D. Me. Dec. 10, 2012)("Because
liability would require an assessment of each transaction to
determine if the absent class member qualified for the discount
rate, it could not be established in one stroke.")(internal
quotations omitted); <u>Boucher</u>, 2012 U.S. Dist. LEXIS, at *24
(finding that "proving or disproving each class member's claim
depends on a file-by-file review of all class members'
transactions" and that such an inquiry is "incompatible with a
class action"); <u>Scott v. First American Title Ins. Co.</u>, 276
F.R.D. 471, 480 (E.D. Ky. 2011)(holding that "[c]ertifying a
(b)(3) class for those who paid a premium that 'exceeded' filed
rates necessitates an intensive fact-finding mission into the
circumstances of each borrowers' refinancing transaction," and
that the predominance requirement of Rule 23 was not met).

---

[25] Q: So if you were looking at the FAST data set alone, you
don't have sufficient data in FAST for you to recalculate the
refinance rate for any of those 202 transactions, is that right?
A: That's correct.
(Pakter Dep. 105:18-22).

Finally, there is another potential hurdle to Plaintiffs meeting the predominance requirement. In its recent Comcast opinion, the Supreme Court, in addition to the other predominance requirements already discussed above, stated that if "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class," certification is inappropriate. Comcast, 133 S. Ct. at 1432. More specifically, the Court stated that to satisfy the dictates of Rule 23(b)(3), plaintiffs must show "that damages are capable of measurement on a classwide basis." Id. at 1433. In the instant matter, Plaintiffs clearly admit that that "the only individual issues in this case are those of damages – the determination of how much individual Class members were overcharged." (Pls.' Br. at 27). Thus, Plaintiffs cannot demonstrate damages on classwide basis.

There is disagreement among the parties, however, and certainly among the courts within the Third Circuit, as to whether or not this "damages on a classwide basis" language is merely dicta or binding precedent. Compare, Bright v. Asset Acceptance, LLC, 292 F.R.D. 190, 2013 U.S. Dist. LEXIS 108432, at * 36 (D.N.J. 2013)(finding that the "Supreme Court's recent opinion in [Comcast v.] Behrend is clear that a plaintiff seeking class certification must present a reliable method for calculating damages on a class-wide basis."), with Reyes v.

<u>Zions First National Bank</u>, No. 10-345, 2013 U.S. Dist. Lexis 136312, at *19 n. 5 (E.D. Pa. Sept. 23, 2013)(finding that the <u>Comcast</u> holding placed "an emphasis on a court's ability to delve into the merits of case. . . and not on the necessity of proving damages on a classwide basis.").[26]

Because Plaintiffs' quest for class certification fails on several other grounds, as discussed above, this Court need not resolve the issue of whether the disputed language in the <u>Comcast</u> opinion is, in fact, dicta. If not dicta, certainly this language presents yet another bar to class certification in the instant matter as the Plaintiffs have presented no method for measuring damages on a classwide basis, as plainly admitted in their moving brief. (Pls.' Br. at p. 27).

V.    <u>Conclusion</u>

For the reasons set forth above, this Court finds that the putative class is not readily ascertainable and that individualized fact-finding will overwhelm issues common to the

---

[26] The disagreement among Courts analyzing the <u>Comcast</u> decision stems from language in the dissenting opinion which states that "the decision should not be read to require, as a prerequisite to certification, that damages attributable to a classwide injury be measureable 'on a class-wide' basis.'" <u>Comcast</u>, 133 S. Ct. at 1437 (Ginsburg & Breyer, JJ., dissenting).

proposed class.  Therefore, the Plaintiffs' motion for class

certification is denied.

s/Renée Marie Bumb
RENÉE MARIE BUMB
United States District Judge

Dated:    January 27, 2014